IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

ERIKA BUCKLEY,                          *

    Plaintiff,                        *

vs.                                     *
                            CASE NO. 4:19-CV-49 (CDL)

RYAN MCCARTHY,                          *
*Secretary of the Army*,
                          *

    Defendant.                        *
_____         *

O R D E R

    Plaintiff contends that her former employer, the Department of the Army, violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* by subjecting her to a hostile work environment and proposing her removal from federal service. Defendant moves for summary judgment on all of Plaintiff's claims. For the following reasons, Defendant's motion (ECF No. 33) is granted.

SUMMARY JUDGMENT STANDARD

    Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing

party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

FACTUAL BACKGROUND

Viewed in the light most favorable to Plaintiff, the record reveals the following facts.  Plaintiff worked as a speech pathologist for the Traumatic Brain Injury ("TBI") Clinic at Martin Army Hospital located on Fort Benning from 2010 to 2017.  Buckley Dep. 33:4-15, ECF No. 35.  The TBI Clinic treated active-duty military members and their family members who suffered head injuries, including mild and moderate traumatic brain injuries. *Id.* at 63:1-19.  In addition to Plaintiff, the TBI Clinic was staffed by two primary care physicians, two nurse case managers, two neuropsychologists, one occupational therapist, one physical therapist, one occupational therapist assistant, one physical therapist assistant, two licensed practical nurses, a social worker, a psychologist, and front desk assistants.  *Id.* at 46:18-47:8.  During Plaintiff's employment, Dr. Brian Ribeiro was a primary care provider, Ute Chavers was a nurse case manager, and Robert Cooper was an occupational therapist at the clinic.  *Id.* at 47:19-48:6, 48:21-49:6, 123:10-12.  The TBI Clinic followed Defendant's chain of command, which involved progressive levels of

supervision.  Miller Dep. 18:1-17, ECF No. 42.  Plaintiff's first-level supervisor was Major Yaoyao Zhu, and her second-level supervisor was Major John Miller, meaning that Major Zhu reported to Major Miller.  Buckley Dep. 41:1-2.  Major Miller became the Department of Rehabilitation services chief in July 2015; in that role, he oversaw chiropractic, pain management, the TBI Clinic, and occupational therapy at Martin.  Miller Dep. 27:8-17.  Plaintiff was the only black provider at the TBI Clinic.  Buckley Decl. ¶ 3, ECF No. 40-13.  As discussed below, Plaintiff contends that Major Miller, Major Zhu, Dr. Ribeiro, Cooper, and Chavers all mistreated her during her employment.

Plaintiff's claims are based in part on procedures and meetings related to patient assignments and patient care.  Defendant's patient-assignment procedure worked in the following manner.  Primary care physicians outside of the TBI Clinic would refer patients to the clinic.  Buckley Dep. 58:10-14.  One of the clinic's primary care providers would see the patient first.  *Id.* at 58:23-59:1.  After that, the provider would refer the patient to neuropsychology for testing and based on those test results, the provider would refer the patient to a specialty provider at the clinic to meet that patient's unique needs.  *Id.* at 59:9-19, 60:4-7, 62:14-17.  Plaintiff was one of these specialty providers, although not every patient needed to see her.  *Id.* at 59:22-25.  As a speech pathologist, Plaintiff evaluated patients for

cognitive linguistic deficit secondary to traumatic brain injury, assembled a treatment plan to remediate the deficits, and provided individual and group therapy. *Id.* at 33:22-34:7. Plaintiff testified that Defendant assigned her fewer patients than Cooper, the occupational therapist, because she was a woman. *Id.* at 122:23-123:12.

Plaintiff also contends that she was discriminated against and harassed at weekly meetings called multi-disciplinary meetings, or "multi-D meetings," which were attended by all of the TBI Clinic medical providers. *Id.* at 52:2-53:13. At these meetings, the medical providers discussed patients and patient care. *Id.* at 53:24-54:3, 56:13-57:10. In March 2017, Plaintiff was scheduled to give an "in-service"—an instructional presentation about her field of work. Chambers Dep. 55:18-25, ECF No. 45. This particular multi-D meeting was scheduled in a new location, and Plaintiff could not initially get into the area where the meeting was being held. Buckley Dep. 127:18-22. Plaintiff therefore arrived a few minutes late. Chambers Dep. 56:2-14. In front of the rest of the TBI Clinic providers, Major Zhu reprimanded her, saying "you should have been here on time. Why didn't you have your stuff together[?] Didn't you know we were having this meeting?" *Id.* at 56:11-14. Plaintiff testified that Major Zhu yelled at her, and she tried to explain that she could not initially access the area where the meeting was being held.

Buckley Dep. 128:16-21.  Plaintiff was hurt, embarrassed, and humiliated by this interaction.  Chambers Dep. 55:7-17, 56:17-20. She also testified that black people being late is a racial stereotype.  Buckley Dep. 154:9-12.  She did not raise any evidence that Major Zhu explicitly referenced her race during this confrontation.

Plaintiff and Dr. Ribeiro had a contentious working relationship while she was employed at the TBI Clinic.  At multi-D meetings, providers would sometimes decide to send white patients to Plaintiff, but Dr. Ribeiro would often divert those patients to off-base speech pathologists or Cooper.  Ortiz Decl. ¶¶ 2, 7, ECF No. 40-14.  One provider, Dr. Felix Ortiz, declared that this was a pattern and practice at the TBI Clinic.  He stated that he would recommend that white patients be referred to Plaintiff, they would see her for an initial consultation appointment, they would have a follow-up appointment with Dr. Ribeiro, and then Dr. Ribeiro would allege that the patients complained about Plaintiff so that he could refer the patients to Cooper.  *Id.* ¶ 7.  This did not happen with black patients.  *Id.*  Dr. Ortiz also declared that Dr. Ribeiro and Chavers told white, male patients negative things about Plaintiff, and this prompted those patients to complain about her. *Id.* ¶ 8.  During multi-D meetings, Dr. Ribeiro was dismissive of Plaintiff.  Chambers Dep. 47:15-19.  He would often cut her off and interrupt her when she was speaking, although he would

sometimes cut off and interrupt white, male providers too. *Id.* at 47:22-48:8.

In July 2014, Dr. Ribeiro wrote a memorandum about Plaintiff's conduct. Ribeiro Dep. 90:16-91:2. This memorandum stated that Plaintiff emailed protected health information ("PHI") to "individuals outside of the department who are not providers in the clinic." Ribeiro Dep. Ex. 2, Mem. from B. Ribeiro (July 22, 2014), ECF No. 43-2. Dr. Ribeiro wrote that he spoke with Plaintiff and informed her that she had violated the clinic's PHI disclosure policy and that, in the future, she should not copy or forward emails to anyone outside the clinic or department if those emails included discussions about patients, staff, or PHI. *Id.* Dr. Ribeiro gave a copy of this memorandum to the clinic administrator, who placed it in Plaintiff's personnel file. Ribeiro Dep. 91:3-17.

Sometime in 2016, Plaintiff had a meeting with another employee and Dr. Ribeiro about a scheduling conflict with a patient. Chambers Dep. 26:25-27:10. Dr. Ribeiro became angry with Plaintiff during this meeting, and, after the meeting ended, he yelled "are you happy now, Erika?" at Plaintiff. *Id.* at 28:2-13. This interaction left Plaintiff "visibly shaken." *Id.* at 34:18-25. Dr. Ribeiro made another black, female employee feel uncomfortable on a few occasions when he inappropriately looked at her up and down. *Id.* at 43:11-19. At an unspecified time, Dr.

Ribeiro called Plaintiff an "angry black woman." Buckley Dep. 124:14-15. He also told a patient that Plaintiff had "angry black woman syndrome," so that patient should be careful with her. *Id.* at 124:15-125:10. Plaintiff testified that being referred to as an "angry black woman" is a stereotype. *Id.* at 153:6-8. At another unspecified time, Dr. Ribeiro made a comment that "a monkey can do the job," apparently in reference to one of Plaintiff's job duties that Cooper and Dr. Ribeiro wanted to assign to an occupational therapy assistant. *Id.* at 154:2-5. Plaintiff declared that Cooper also made a comment about a monkey in front of Major Miller. Buckley Decl. ¶ 12.

At some other time during Plaintiff's employment, Major Zhu asked Plaintiff if all of her children had the same father. Buckley Dep. 124:19-20. Plaintiff believes that Major Zhu's question was based on a racial stereotype. *Id.* at 153:6-154:1. Plaintiff also testified that Defendant treated Dr. Ribeiro, Chavers, and Cooper more favorably because of their race in comparison to her, although she did not specify how. *Id.* at 135:6-10.

As noted above, some TBI Clinic patients complained about Plaintiff. Chavers Dep. 77:4-5, ECF No. 44. On August 20, 2014, Plaintiff treated a patient who complained that her assessment was "too easy" and "very silly." Mauricio Decl., Chronological R. of Med. Care, S/O Note Written by Buckley, Erika (Aug. 20, 2014), ECF

No. 33-3 at 159.  Plaintiff recorded that the patient became "angry and argumentative" and "continued to speak angrily and walked out." *Id.*  On February 22, 2016, another patient reported a stuttering problem, but Plaintiff explained to the patient that the typical symptoms for that condition were not present.  Mauricio Decl., Chronological R. of Med. Care, S/O Note Written by Buckley, Erika (Feb. 22, 2016), ECF No. 33-3 at 189.  The patient "became irate," and Plaintiff offered to refer the patient to psychology or social work.  *Id.*  Plaintiff recorded that the patient filled out a patient satisfaction survey that stated: "Today, I felt as if [I] was being attacked in character, Ms. Buckley didn't appear to have a genuine concern for the issue I sought help for."  *Id.*

On April 3, 2017, Plaintiff recorded that a different patient "displayed anger and defensive posture and language" that made her feel uncomfortable during treatment.  Mauricio Decl., Chronological R. of Med. Care, S/O Note Written by Buckley, Erika (Apr. 3, 2017), ECF No. 33-3 at 42.  Plaintiff offered to refer the patient to the occupational therapist or another medical clinic, but the patient demanded to see "whoever is next in charge" and saw the clinic administrator.  *Id.* at 43.  On April 25, 2017, Plaintiff emailed Major Miller, Major Zhu, Colonel Randy Dorsey, Beverly Simmons, and Barbara Parker about that patient's chart. Buckley Dep. 106:18-23; Buckley Dep. Ex. 4, Email from E. Buckley to Y. Zhu *et al.* (Apr. 25, 2017, 10:49 AM), ECF No. 35-4 at 2-3

("Apr. 25 Email").  Beverly Simmons was a civilian Health Insurance
Portability  and  Accountability  Act  ("HIPAA")  officer  with
Defendant, and Barbara Parker was Plaintiff's union representative
who did not work for Defendant.  Buckley Dep. 107:2-6.  In the
email,  Plaintiff  complained  that  Chavers  wrote  a  negative  note
about her in the patient's chart, and Plaintiff wanted that note
removed.  *Id.* at 107:14-25; Apr. 25 Email.  Plaintiff attached a
copy  of  the  note  from  the  patient's  chart,  which  contained  the
patient's medical information, to the email.  Apr. 25 Email ("A
copy of the note is attached.").  Plaintiff testified that "it was
a mistake" to send this email to Parker and that she did not intend
for Parker "to be on the email that had the patient information on
it."  Buckley Dep. 110:10-17, 111:3-23.  Later, Plaintiff visited
Congressman  Sanford  Bishop's  office  to  complain  about  Chaver's
negative  note  about  her.  *Id.* at 112:6-21.  Rather than email
Congressman Bishop or anyone in his office, she took "information"
to his office, and people from the office made copies of it.  *Id.*
at 113:3-17.  As noted below, that "information" included patient
information.

In early June 2017, Frederick Davis, an officer in Defendant's
Patient Administration Division, investigated Plaintiff's conduct
and  determined  that  Plaintiff's  April  25  email  constituted  a
"substantiated breach" of HIPAA.  Def.'s Mot. for Summ. J. Ex. 2,
Mem. from F. Davis (June 1, 2017), ECF No. 33-4 ("Ms. Buckley might

not have realized at the time she hit the 'send' button that she was violating HIPAA, but violate it she did."). On June 14, 2017, Major Zhu wrote a memorandum recommending that Defendant remove Plaintiff from federal service because of her HIPAA violation. Def.'s Mot. for Summ. J. Ex. 3, Mem. from Y. Zhu (June 14, 2017), ECF No. 33-5. This memorandum specifically detailed that Plaintiff had released unredacted patient medical information to Parker, who was not authorized to see that information. *Id.*

Defendant's progressive disciplinary policy included a "Table of Penalties for Various Offenses." Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 8, Civilian Personnel, Conduct & Discipline of Employees at USA-001001, ECF No. 40-10. This table provided "a list of the of the infractions committed most frequently by agency employees, along with a suggested range of penalties for each. The penalties are graduated in severity based on whether an employee has no previous record of misconduct, has a single incident of documented misconduct, has two previous incidents of documented misconduct, etc." *Id.* The table also stated that it is "a suggested range of penalties. It is a guide to discipline, not a rigid standard. Deviations are allowable for a variety of reasons . . . . When the offense the employee committed is especially serious, compared to normal degree of the stated offense, there may be a basis for exceeding the maximum suggested penalty." *Id.* The table provided suggested penalties for first

10

offenses, second offenses, and third offenses. *Id.* Under the offense labeled "Failure to observe written regulations, orders, rules, or procedures," the table provided the following three categories of violations and various penalties associated with specific violations:

| 14. Failure to observe written regulations, orders, rules, or procedures | a. Violation of administrative rules or regulations where safety to persons or property is not endangered. | Written reprimand to 1 day suspension | 1-14 day suspension | 5 day suspension to removal |
| | b. Violation of administrative rules or regulations where safety to persons or property is endangered | Written reprimand to removal | 30 day suspension to removal | Removal |
| | c. Violations of official security regulations. Action against National Security | | | |
| | (1) Where restricted information is not compromised and breach is unintentional | written reprimand to 5 day suspension | 1-14 day suspension | 5 day suspension to removal |
| | (2) Where restricted information is compromised and breach is unintentional | Written reprimand to removal | 30 day suspension to removal | Removal |
| | (3) Deliberate violation | 30 day suspension to removal | Removal | |

*Id.* at USA-001004.

On July 12, 2017, Major Zhu wrote Plaintiff a letter informing her that she would be removed from federal service in 30 days for violating HIPAA on April 25, 2017. Def.'s Mot. for Summ. J. Ex. 4, Letter from Y. Zhu to E. Buckley (July 12, 2017), ECF No. 33-6. On August 17, 2017, Major Miller wrote Plaintiff a letter informing her that she was being placed on administrative leave pending an investigation into a second HIPAA violation, although the letter did not provide any facts surrounding the alleged violation. Def.'s Mot. for Summ. J. Ex. 5, Letter from J. Miller

to E. Buckley (Aug. 17, 2017), ECF No. 33-7. That same day, Plaintiff filed an Equal Employment Opportunity ("EEO") complaint of discrimination, alleging that Major Zhu and Major Miller had discriminated against her based on her race and age and retaliated against her by proposing her termination. *See* Order on Mot. to Dismiss 3, 6 (Mar. 4, 2020), ECF No. 24. On August 28, 2017, Davis wrote another memorandum finding that Plaintiff committed a second substantiated violation of HIPAA when she gave Congressman Bishop a patient's medical information without that patient's authorization. Def.'s Mot. for Summ. J. Ex. 3, Mem. from F. Davis (Aug. 28, 2017), ECF No. 35-5.

Plaintiff filed a written rebuttal to the proposed removal on September 14, 2017, and Major Miller heard her oral reply on September 20. Def.'s Mot. for Summ. J. Ex. 6, Letter from J. Miller to E. Buckley 1 (Oct. 19, 2017), ECF No. 33-8. On October 19, 2017, Major Miller wrote Plaintiff to inform her that he had sustained Major Zhu's decision to remove her from federal service. *Id.* at 3. He explained that he had considered the nature and seriousness of the offense, Plaintiff's intentional violation of HIPAA, the consistency of this penalty in comparison to penalties assessed to other employees who committed the same or similar offenses, and whether other sanctions would deter future HIPAA violations. *Id.* at 1-3. Miller stated that Plaintiff's removal would be effective on October 21, 2017. *Id.* at 3-4. Plaintiff,

12

however, resigned on October 20, 2017.  Def.'s Mot. for Summ. J.
Ex. 7, Mem. from E. Buckley (Oct. 20, 2017), ECF No. 33-9.
Plaintiff resigned because she was going to get fired and wanted
to protect her professional license.  Buckley Dep. 152:21-23.
Plaintiff was replaced by a black female in August 2018.  Hill
Decl. ¶ 5, ECF No. 33-10.

Defendant's human resources specialist searched Defendant's
Defense Civilian Personnel Data System Portal and Electronic
Official Personnel File and reviewed personnel records and
disciplinary files for disciplinary actions related to HIPAA
violations.  Hill Decl. ¶¶ 1, 3.  According to her findings, the
following ten employees were disciplined for HIPAA violations in
the following ways from 2014 to 2020:

- A white female resigned in lieu of removal in 2014;

- A black female received a letter of reprimand and
  had to undergo remedial HIPAA training in 2015;

- A white female received a letter of reprimand in
  2015;

- A black female received a one-day suspension and
  remedial HIPAA training in 2015;

- A black female resigned in lieu of removal in 2017;

- A black female resigned in 2017;

- A white female was removed in 2018;

- A black male was suspended for 30 days in 2018;

- A black female was suspended for 21 days in 2018;
  and

- A black female was suspended for 20 days and received remedial HIPAA and Privacy Act training in 2020.

*Id.* ¶ 4; *see* Brooks Decl. ¶ 3, ECF No. 33-11.  Neither party provided any evidence of the details or severity of these HIPAA violations.

In addition to her August 17, 2017 EEO complaint, Plaintiff filed four other EEO complaints—one in December 2014 and three between January 2016 and July 2016.  Dr. Ribeiro became aware that Plaintiff had filed an EEO complaint about his conduct sometime between July and September 2016.  Ribeiro Dep. 52:19-54:5.  At an unspecified time, Major Miller became aware that Plaintiff had filed a formal EEO complaint because the EEO office sent him an email about the complaint.  Miller Dep. 74:11-25.  Major Zhu was also aware of Plaintiff's EEO activity.  Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. 7, Report of Investigation USA-000911, ECF No. 40-9.

### DISCUSSION

Pursuant to Title VII, Plaintiff alleges claims for disparate treatment and retaliation based on her proposed removal, a hostile work environment claim, and a retaliatory hostile work environment claim.[1]  The Court considers each claim below.

---

[1] Although Plaintiff's EEO complaint included an allegation of age discrimination, Plaintiff's present action does not.

## I.   Disparate Treatment

Because Plaintiff was a federal employee, Title VII's federal-sector provision, 42 U.S.C. § 2000e-16, applies to her disparate treatment claim.  That provision, the meaning of which the Eleventh Circuit recently addressed in *Babb v. Secretary, Department of Veteran Affairs*, 992 F.3d 1193 (11th Cir. 2021), "says, in relevant part, 'All personnel actions affecting employees . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin.'"   *Babb*, 992 F.3d at 1198 (alterations in original) (quoting 42 U.S.C. § 2000-e-16(a)).   In *Babb*, the Eleventh Circuit explained that "[i]f a decision is not 'made free from any discrimination based on' that which § 2000e-16(a) protects, then an employer may be held liable for that discrimination regardless of whether that discrimination shifted the ultimate outcome.  So long as the protected characteristic is 'the but-for cause of *differential treatment*,' then it doesn't matter (for purposes of liability) that the protected characteristic isn't 'a but-for cause of *the ultimate decision*.'" *Id.* (quoting *Babb v. Wilkie*, 140 S. Ct. 1168, 1174 (2020)).

The Eleventh Circuit also noted that "even when there are non-pretextual reasons for an adverse employment decision . . . the presence of those reasons doesn't cancel out the presence, and the taint, of discriminatory considerations."   *Id.* at 1204

("Without quite saying as much, then, it seems that the Supreme Court accepted Babb's argument 'that the District Court should not have used the *McDonnell Douglas* framework.'" (quoting *Babb*, 140 S. Ct. at 1172)); *see Durr v. Sec'y, Dep't of Veterans Affs.,* 843 F. App'x 246, 247 (11th Cir. 2021) (per curiam) ("Because both the *McDonnell Douglas* framework and the convincing-mosaic test are methods of showing that the protected characteristic was the but-for cause of the ultimate decision, those tests no longer apply."). In *Durr* for example, a panel of the Eleventh Circuit considered a district court's decision to grant summary judgment on plaintiff's Title VII gender discrimination and retaliation claims.  *Id.* Because "a plaintiff no longer need show that his protected activity or status was the but-for cause of the adverse action to state a claim under § 2000e-16," the panel explained, "a plaintiff's claim survives if 'discrimination play[ed] *any part* in the way a decision [was] made.'"  *Id.* (alterations in original) (quoting *Babb*, 140 S. Ct. at 1174).

Therefore, the Court must determine whether Plaintiff raised evidence that her race played any part in Defendant's decision to remove her from federal service.[2]  Major Zhu made the decision to

---

[2] The Court previously dismissed Plaintiff's Title VII sex discrimination claims based on Major Miller and Major Zhu's conduct for failure to exhaust, so the Court only considers Plaintiff's Title VII race discrimination claims to the extent those claims are based on Major Miller and Major Zhu's conduct.  Order on Mot. to Dismiss 7 (Mar. 4, 2020).  It is undisputed that only Major Zhu and Major Miller

remove Plaintiff from federal service after her initial HIPAA violation, and Major Miller sustained that decision. Plaintiff argues that Major Zhu and Major Miller discriminated against her by proposing and sustaining her removal. Plaintiff first makes a conclusory argument that comments made by and "ratified" by her supervisors demonstrate their racial animus. The evidence does show that Major Zhu asked Plaintiff if all of her children had the same father, but this single question does not create a reasonable inference that Major Zhu considered Plaintiff's race when deciding to propose her removal. Furthermore, Plaintiff failed to cite any evidence that Major Zhu or Major Miller "ratified" comments made by other employees, and she did not explain how any alleged "ratification" supports the conclusion that they considered her race when deciding to remove her. The Eleventh Circuit "has consistently held that conclusory allegations without specific facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924-925 (11th Cir. 2018) (quoting *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000)); *see Leigh*, 212 F.3d at 1217 (quoting *Gossett v. Du-Ra-Kel Corp.*, 569 F.2d 869, 872 (5th Cir. 1978)[3]) ("[O]ne who resists summary judgment must meet

---

participated in the decision-making process that resulted in the proposed removal.

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the movant's affidavits with opposing affidavits setting forth specific facts to show why there is an issue for trial.").

Plaintiff next argues that Defendant did not propose the removal of three employees who also committed HIPAA violations between 2014 and 2017 and this evidence demonstrates that Defendant violated Title VII when it proposed her removal.  Two of those employees were also black, *see* Hill Decl. ¶ 4, so even if they engaged in conduct similar to Plaintiff but were disciplined differently, their treatment does not suggest that race played a part in the decision to remove Plaintiff from federal service. The remaining employee, a white female who worked in the Department of Medicine, received a letter of reprimand for a HIPAA violation in 2015.  Although this employee was outside Plaintiff's protected class, Plaintiff points to no other evidence supporting her bare conclusion that their situations were comparable.  In fact, Plaintiff did not even direct the Court to any evidence that Major Zhu or Major Miller were involved in the discipline decision regarding the white female employee.  Thus, the evidence regarding other employees who committed HIPAA violations does not establish that race played any role in the decision to remove Plaintiff from federal service.

Lastly, Plaintiff argues that Major Zhu and Major Miller ignored Defendant's progressive disciplinary policy and this departure from the policy demonstrates racial animus.  Plaintiff

misstates the disciplinary policy.  That policy explicitly states that it is "not a rigid standard.  Deviations are allowable for a variety of reasons."  Civilian Personnel, Conduct & Discipline of Employees USA-001001.  The penalties provided by that policy were not mandatory, only suggested.  Plaintiff's glaring omission of any reference to Major Miller's finding that she intentionally violated HIPAA is telling.  Defendant's disciplinary policy provided that removal was an appropriate penalty for a deliberate violation of HIPAA.  *Id.*

Plaintiff has not cited any evidence that creates a genuine fact dispute as to whether either Major Zhu or Major Miller considered her race when deciding to propose or sustain her removal.  In other words, no evidence exists that her race played any part in their decision-making.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's disparate treatment claim based on her proposed removal.

## II. Retaliation

Plaintiff's Title VII retaliation claim based on her proposed removal is equally unavailing.[4]  She has failed to produce evidence from which a reasonable jury could conclude that her statutorily protected activity played a part in Defendant's decision to propose

---

[4] "Though § 2000e-16 does not expressly prohibit retaliation for filing a charge based on those protected characteristics, [the Eleventh Circuit has] explained that retaliation based on protected traits is itself discrimination."  *Durr*, 843 F. App'x at 247 n.1.

her removal. *See Ingram v. Sec'y of the Army,* 743 F. App'x 914, 918 (11th Cir. 2018) (per curiam) (explaining elements of a retaliation claim); *see also Durr*, 843 F. App'x at 247 (explaining that courts should consider whether protected activity played any part in defendant's adverse employment actions pursuant to Title VII's federal-sector provision).

Plaintiff relies entirely upon the temporal proximity between her protected conduct and Defendant's adverse employment action to support her claim. Plaintiff is correct that sometimes "[t]he burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" *Id.* (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Id.* "Thus, in the absence of other evidence tending to show causation, if there is a substantial delay between the protected expression and the adverse action, the complaint of retaliation fails as a matter of law." *Id.*

Here, it is undisputed that Major Zhu informed Plaintiff about her recommendation of removal on July 12, 2017, nearly a year after Plaintiff's most recent 2016 EEO complaint. Although Plaintiff

cited evidence that Major Zhu was aware of her 2014 and 2016 EEO activity, that activity is too temporally distant from the removal decision to establish causation on its own, and Plaintiff did not point to any evidence tending to show causation between her pre-2017 EEO complaints and Major Zhu's recommendation of removal. After Major Zhu recommended Plaintiff's removal, Plaintiff filed an EEO complaint of discrimination about Major Zhu and Major Miller on August 17, 2017. Major Miller sustained Major Zhu's recommendation on October 19, 2017; by that time, Major Miller was aware of Plaintiff's August 2017 EEO complaint.  Again, though, Major Zhu informed Plaintiff of her recommended removal before Plaintiff filed her 2017 EEO complaint.  So, the wheels were in motion for Plaintiff's removal prior to her protected activity, and Major Miller later sustained that decision.  Plaintiff pointed the Court to no evidence that Defendant deviated from the normal procedure for processing a recommendation of removal.  The fact that Plaintiff filed an EEO complaint 36 days after she was told that a recommendation of removal was being made and 63 days before that recommendation was formally sustained is not probative of any causal connection between her protected conduct and the sustaining of the pre-protected conduct recommendation.

Temporal proximity alone is rarely sufficient to create a genuine factual dispute as to causation, and certainly the circumstances presented here do not support such a conclusion.

Because Plaintiff failed to direct the Court to any evidence that her August 2017 EEO activity played any part in Major Zhu's recommendation or Major Miller's decision to sustain that recommendation, Defendant is entitled to summary judgment on Plaintiff's retaliation claim based on her proposed removal.

## III. Retaliatory Hostile Work Environment

Plaintiff also alleges she was subjected to a hostile work environment based on her EEO activity. Before the Eleventh Circuit's decision in *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 862 (11th Cir. 2020) (per curiam), a plaintiff alleging a retaliatory hostile work environment claim had to establish that she engaged in a statutorily protected activity, she suffered harassment that was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and a causal link between the two. *See Gowski v. Peake*, 682 F.3d 1299, 1311-12 (11th Cir. 2012), *abrogated by Monaghan*, 955 F.3d at 862. But now, "retaliatory hostile work environment claims . . . prevail if the conduct complained of 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 836 (11th Cir. 2021) (quoting *Monaghan*, 955 F.3d at 862). The severe-or-pervasive standard therefore no longer applies to retaliatory hostile work environment claims. *See Babb*, 992 F.3d at 1207.

For example, in *Monaghan*, the evidence revealed that plaintiff's supervisor "threatened both termination and possible physical harm" shortly after she found out that the plaintiff had complained about the supervisor's racist and ageist comments. 955 F.3d at 862-63.  The Eleventh Circuit determined that this conduct well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.* Specifically, the supervisor said that plaintiff had "cut her own throat" by complaining and was "fucked." *Id.* at 863.  She also threatened plaintiff by stating that she and her boyfriend knew where plaintiff lived and pounded her fists on a table and said, "how dare you make complaints against me." *Id.* at 863.  And she informed plaintiff that she was training someone to take her job and said, "You better watch it, white girl." *Id.*

Here, Plaintiff cited evidence that Major Miller, Major Zhu, and Dr. Ribeiro knew about her protected activity.  Plaintiff, however, has not directed the Court to evidence that any of them engaged in harassment that well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. Rather, the evidence reveals conduct that was much less egregious than the conduct in *Monaghan*.  Major Miller, Major Zhu, and Dr. Ribeiro did not use profanity towards Plaintiff and did not verbally or physically threaten her.  While some of their conduct may have been inappropriate, the Court finds that it would not

have dissuaded a reasonable worker from making or supporting a charge of discrimination. And, even if it had, Plaintiff has not cited any evidence establishing a causal connection between her protected activity and the harassment; she identified no evidence in the record demonstrating that her protected activity in any way prompted anyone to harass her. For these reasons, Defendant is entitled to summary judgment on Plaintiff's retaliatory hostile work environment claim.

## IV.  Hostile Work Environment

In addition to her retaliatory hostile work environment claim, Plaintiff brings a traditional hostile work environment claim. "To establish a prima facie case of a hostile work environment, a party must show that (1) [she] is a member of a protected group; (2) who has been subjected to unwelcome harassment; (3) based on a protected characteristic; (4) that was 'sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment'; and (5) that [her] employer is vicariously or directly liable for the environment." *Ingram*, 743 F. App'x at 917 (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)). "The requirement of 'severe or pervasive' harassment contains an objective and a subjective component." *Id.* (quoting *Miller*, 277 F.3d at 1276). "Thus, to be actionable, this behavior must result in both an environment that a reasonable

person would find hostile or abusive and an environment that the victim subjectively perceives to be abusive." *Id.*

"In assessing the objective severity of the harassment, [courts] consider: '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'" *Id.* (quoting *Miller*, 277 F.3d at 1276); *see, e.g., Tonkyro*, 995 F.3d at 838-39 (finding that summary judgment on sex-based hostile work environment claims was proper because some conduct was only observed and was not directed at plaintiff and other physical conduct was not sexually charged or predatory); *cf. Fernandez v. Trees, Inc.*, 961 F.3d 1148, 1154-55 (11th Cir. 2020) (finding a material fact dispute about whether harassment was objectively severe or pervasive where evidence showed that vulgar, derogatory remarks were made "continually" in the presence of co-workers).

"The Supreme Court has instructed that Title VII is only implicated in the case of a workplace that is 'permeated with discriminatory intimidation, ridicule and insult,' not where there is the 'mere utterance of an . . . epithet.'" *Miller*, 277 F.3d at 1276-77 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).   Courts should "proceed with common sense, and an appropriate sensitivity to social context, to distinguish between

general office vulgarity and the conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive." *Tonkyro*, 995 F.3d at 838 (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010)).

For example, in *Smelter v. Southern Home Care Services, Inc.*, 904 F.3d 1276, 1285-86 (11th Cir. 2018), the Eleventh Circuit found that harassment was objectively hostile because plaintiff heard humiliating, racist comments every day for two months as she was called a "dumb black nigger," told that she resembled a "mixed monkey," heard comments about how President Obama looked like a monkey, and a variety of other racially charged stereotypes, including that black men are lazy and the scum of the earth and that black people should be sent back to Africa. *Id.* The Eleventh Circuit acknowledged that evidence of the fourth factor—whether the conduct interfered with plaintiff's work—was lacking, "[b]ut the Supreme Court has made clear that 'no single factor is required' to establish the objective component." *Id.* at 1287 (quoting *Harris*, 510 U.S. at 23). "Considering the totality of the circumstances, particularly the daily frequency and extreme severity of the harassment, including racist remarks made directly to [plaintiff] about her, [the Eleventh Circuit concluded] that she provided sufficient evidence for a reasonable jury to find that the harassment was objectively severe or pervasive." *Id.* Similarly, in *Miller*, the evidence showed that employees shouted

"derogatory names in an intimidating manner" at plaintiff several times a day.  *Miller,* 277 F.3d at 1276-77.  And those incidents were "humiliating and degrading" to that plaintiff because they often occurred "in the course of reprimanding him in front of others."  *Id.* at 1277.

Here, considering the totality of the circumstances and the factors listed above, the Court finds that Plaintiff has not pointed to evidence that she experienced harassment at the TBI Clinic that was objectively severe or pervasive.[5]  Unlike in *Miller*, *Fernandez*, and *Smelter*, Plaintiff points to no evidence that anyone frequently subjected her to physically threatening or humiliating insults or comments.  Instead, she cites sporadic, isolated incidents in which her co-workers or supervisor made rude comments or encouraged patients to complain about her.  Although this conduct may have been inappropriate, it was not sufficiently

---

[5] In her response to Defendant's motion for summary judgment, Plaintiff lists sixteen incidents in an effort to support her hostile work environment claim, but she does not cite evidence establishing that the majority of these incidents actually occurred.  "For factual issues to be considered genuine, they must have a real basis in the record."  *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (quoting *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996)).  "For instance, mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion."  *Id.*  "Statements by counsel in briefs are not evidence."  *Travaglio v. Am. Express Co.*, 735 F.3d 1266, 1270 (11th Cir. 2013) (quoting *Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980)); *see also Jefferson*, 891 F.3d at 923-24 (quoting *Leigh*, 212 F.3d at 1217) ("[C]onclusory allegations without specific supporting facts have no probative value.").  Therefore, in deciding the motion for summary judgment, the Court disregards Plaintiff's conclusory allegations and only considers the incidents that she supported by citations to the record.

severe or pervasive.   And, while she does claim that some of the conduct interfered with her job performance, her subjective feelings are not sufficient to meet her burden.   The harassment must have been *objectively* severe or pervasive enough to interfere, and it was not according to Circuit precedent.   Therefore, Plaintiff's hostile work environment claim fails as a matter of law, and Defendant's motion for summary judgment as to that claim is granted.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 33) is granted.

IT IS SO ORDERED, this 11th day of June, 2021.

S/Clay D. Land
_____
CLAY D. LAND
U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA